THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY ALLGOOD, Defendant-Appellant.

First District (2nd Division) No. 1—92—0233

Opinion filed February 16, 1993.

Rita A. Fry, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Janet L. Powers, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant, Gary Allgood, was convicted by a jury of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14), armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2), and home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11). He was sentenced to concurrent prison terms of 30 years, 20 years, and 20 years, respectively. Defendant appeals, arguing that the circuit court (1) improperly restricted his cross-examination of the victim; (2) erred in refusing his tendered instructions on impeachment and a lesser included offense; and (3) erred in refusing his request to give two altered pattern jury instructions. We affirm.

The victim, M.H., first met defendant in 1981 as a friend of her cousin. She had never dated defendant and did not see him again until mid-June 1990, when he spoke to her as she walked home from the train station. The victim recognized defendant and accepted his offer to help

carry her bags to her apartment. At her foyer door, defendant asked to see the victim's apartment. She refused, telling him that her boyfriend would be home soon.

On the night of July 13, 1990, the victim was home alone. At 5:20 a.m. the doorbell rang. She pressed the buzzer to open the downstairs door. She did not know who rang, but thought it may be her boyfriend, who sometimes lived with her. While outside her apartment door, defendant, whom she recognized from his lisp, told her he had been injured and needed to use her bathroom and call the police. She opened the door with the chain still attached and saw defendant hunched over. He looked as if he had been in a fight.

The victim unlatched the chain and invited defendant inside. This was the first time defendant had entered her apartment. She directed him to the bathroom and volunteered to call the police. Defendant looked through the bedroom door and asked if she had company. She ignored his question and turned to use the telephone when she sensed something was wrong.

Defendant asked to be shown the apartment, whereupon the victim told him to leave. Defendant refused. As the victim ran out the front door, defendant grabbed her. The victim screamed. A struggle ensued in the common hallway. Defendant choked the victim and repeatedly told her to be quiet or he would kill her and "slice her open." After defendant wrestled her to the hall floor, he pulled a knife out of his jacket and "stuck" it in her neck. He threatened to kill her if she tried to run. The victim removed her shirt at his direction. He continued to choke her while trying to kiss her and remove her clothes.

Defendant walked the victim back into the apartment and into the bedroom, pulling her by the hair. She once again tried to escape, but he pushed her down onto the bed and smashed her face into the mattress. He continued trying to kiss her, touch her breasts, and remove her pants. She was curled up in a fetal position with her arms across her chest. He bit her arms and her face.

Defendant flipped the victim over and tried to force her legs apart with his legs. He told her that no one was going to come to help her and he would kill her if she told anyone. He pulled off her pants. As she continued crying, he told her she was making too much noise and if anyone came things would be "really bad."

Defendant removed his jeans and his jacket. He laid the knife on top of his jacket at the end of the bed. He put his fingers in her vagina. He then choked her and ordered her to open her legs, which she did. He put his penis in her vagina, during which time he "said stuff like, [']you know you like it.[']" Defendant then ejaculated on the upper inside of

the victim's left leg. She did not know whether he ejaculated in her vagina. According to a medical chart prepared in the hospital emergency room, the victim indicated that he did ejaculate in her vagina. Defendant told her she would not get pregnant.

Afterwards, defendant released the victim, who sat on the bed and cried. He told her that he did not rape her and to stay in the bedroom or he would kill her. He dressed, put the knife in his pocket, and left. After the victim heard the foyer door close, she telephoned the police.

The victim, three Oak Park police officers, and the examining physician testified about the victim's injuries and the events following the attack. Officer Johnny Patterson arrived at the victim's apartment. She told him that a man named Allgood sexually assaulted her. Sergeant John Beerup arrived next. The victim dressed and spoke with him in the hall. She pointed to an address book that she did not recognize, which Beerup seized as evidence. The name "Sid [sic] Allgood" later was found written on the second page. The officers then took her to a hospital where Officer Julie Carramusa took over the case.

The victim gave hospital personnel the clothes she put on after the police arrived. Medical personnel examined her and took samples with a sexual assault kit. The victim had bite marks on her face and arms, bruises and two "poke-holes" on her neck, and a cut on her face. The emergency room physician, Dr. Wayne Carlson, testified that her injuries were consistent with being poked with a knife, choked, and bitten.

Michael Podlecki, a forensic scientist employed by the Illinois State Police, testified that he analyzed the evidence kit samples. No samples showed the presence of semen. The victim's panties inconclusively indicated that seminal material could be present; no genetic markers were present to identify the donor.

Joleen Kragt testified that she lived across the hall from the victim but did not know her. In the early morning hours of July 14, 1990, she was awakened by horrible, loud, and intense screaming from a woman which lasted 20 or 30 seconds. She could not tell where it came from so she did not call police.

Defendant testified that he was released from the penitentiary on June 15, 1990, and was on parole. Defendant knew the victim through her cousin while in high school. They did not date. He saw the victim in mid-June of 1990 and carried her bags to her apartment. She gave him her telephone number so he could contact her to reach her cousin. Defendant did not ask to see her apartment. He called the victim one week later and left a message. On June 28, 1990, around 11 p.m., defendant stopped by the victim's apartment. She told him she had company and to come back another day. One week later, defendant visited

the victim in her apartment to use the telephone and the bathroom. After doing so, he stayed 15 minutes and then left.

A few days before the attack, on July 10 or 11, 1990, around 11 p.m., defendant again visited the victim at her apartment. He made two telephone calls. She was upset. He asked her what was wrong, but she refused to talk. In an attempt to cheer her up, defendant began massaging her hands and shoulders, and "one thing led to the next." Defendant and the victim engaged in consensual sexual intercourse. When he left the apartment that night, he left the address book with her.

Defendant's defense was alibi. He testified that he was at home with his mother, a girl named Tanya, and other people at the time of the assault. Defendant never went to the victim's apartment that night. On cross-examination, he admitted that when he first saw the victim again he told her he had been away at college and did not tell her he had been in jail.

Defendant's mother, Willa Banks, testified that defendant had been home all night. On cross-examination, however, she admitted that she did not see defendant between 5:15 and 10 a.m.

Sydney Allgood testified that he and a friend arrived home at 5 or 5:30 a.m. with food to eat. He saw defendant and Tanya lying on the couch. Sydney ate and watched television. Defendant remained on the couch with Tanya during this time. Sydney fell asleep, but saw defendant and Tanya when he awoke at 8 a.m.

I

Defendant initially contends that the circuit court erred in restricting his cross-examination of the victim about an order of protection she had obtained against her boyfriend.

On cross-examination, defense counsel asked the victim if she had difficulties with her boyfriend, and she responded negatively. Defense counsel then attempted to question her about an order of protection she had obtained against her boyfriend sometime before the rape. In a sidebar conference, the circuit court held that neither the victim's relationship with her boyfriend nor the order of protection she had obtained against him played any role whatsoever in the incident and was therefore irrelevant. Defendant claims this cross-examination would show that the victim had a motive to testify falsely and support his defense of another's guilt. Defendant theorizes that the victim's boyfriend found defendant's address book in her apartment, became angry with her, and beat her. The victim then manufactured the rape to appease her boyfriend.

■ Although generally allowed wide latitude in cross-examining the State's witnesses to show motive to testify falsely, defense counsel does not have "a license to engage in speculative attacks on that witness." (*People v. Rivera* (1986), 145 Ill. App. 3d 609, 622, 495 N.E.2d 1088.) Here, defendant's theory that the victim falsely accused him of rape to appease an angry boyfriend is highly speculative. The impeaching quality of defendant's inquiry relies on a series of conjectural inferences. First, it depends upon the assertion that she obtained an order of protection against her boyfriend, of which there was no evidence. Assuming that there had been such evidence, defendant's claim necessarily would have required the jury to engage in the following mental gymnastics, of which there was no evidence: that the boyfriend found defendant's address book at the victim's apartment; that he examined it and found Allgood's name; that he became angry; and that he beat, bit, and stabbed the victim in the common hallway of the apartment, where the screams were heard, instead of assaulting the victim inside the apartment, where he lived from time to time, in relative privacy. The final, unfounded inference required is that, immediately after the assault by her boyfriend, the victim called police and falsely charged defendant, for some unidentified reason, with rape. Inexplicably, she must be understood by the jury to have charged that defendant raped her at the time of the attack by her boyfriend, rather than on the previous day when he left his address book. To say the least, this chain of inferences is extremely speculative and strains credulity. The restriction of cross-examination for impeachment purposes was proper.

An accused may attempt to prove that someone else committed the crime with which he is charged; however, a circuit court may reject proffered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature. (*People v. Enis* (1990), 139 Ill. 2d 264, 281, 564 N.E.2d 1155; *People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696.) A circuit court's ruling will not be reversed absent a clear showing of abuse of discretion. (*Enis*, 139 Ill. 2d at 281; *Ward*, 101 Ill. 2d at 455-56.) We find no such abuse here.

## II

Defendant argues that the circuit court erred in refusing his tendered instruction on impeachment by prior inconsistent statements. Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. 1981).

■ A medical chart indicated that defendant had ejaculated in the victim's vagina, but during her testimony she stated that she did not know whether he had. The victim also testified that she did not eat or

drink after the attack, but a medical chart indicated otherwise. The instruction tendered here is appropriate only where two statements are inconsistent with each other on a material matter. (*People v. Thomas* (1988), 172 Ill. App. 3d 172, 177, 526 N.E.2d 467.) Assuming, *arguendo*, that the medical charts constituted sufficient evidence of prior inconsistent statements, the failure to instruct the jury on the use of those statements was not reversible error because neither involved a material issue in the case. (See *Thomas*, 172 Ill. App. 3d at 177-78.) Penetration having been charged and supported by evidence, whether and where defendant ejaculated was not a material issue. (See Ill. Rev. Stat. 1989, ch. 38, par. 12—12(f).) It was entirely immaterial whether the victim ate or drank after the attack.

■ Defendant additionally claims that two officers testified at trial to observations not included in their police reports and that this testimony justified his tendered instruction. Officer Patterson testified that the victim told him she was raped, which he omitted from his report. Officer Carramusa testified that the victim was visibly upset when they first met, which she omitted from her report. She also testified that Sergeant Beerup told her where the address book was found, which she omitted from her report as well.

Defendant has waived this argument. At trial he claimed only that the victim made a prior inconsistent statement. *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.

Were we to consider defendant's argument, it would fail. The officers' statements merely showed that they omitted observations from their reports; they were not prior inconsistent statements.

### III

Defendant next identifies error in the circuit court's refusal of his tendered instruction on criminal sexual assault, the lesser included offense of aggravated criminal sexual assault.

■ An instruction on a lesser offense is appropriate where the evidence would permit the jury rationally to find the defendant guilty of the lesser offense and acquit him of the greater. (*People v. Bryant* (1986), 113 Ill. 2d 497, 507, 499 N.E.2d 413.) An instruction on a lesser offense rationally might be precluded by evidence negating the possibility of a finding of guilt on the lesser offense than the one charged. (*Bryant*, 113 Ill. 2d at 507.) It is error to instruct the jury on the lesser included offense when there is no evidence to support such instruction. (*People v. Brown* (1988), 171 Ill. App. 3d 391, 402, 525 N.E.2d 576.) Criminal sexual assault becomes aggravated criminal sexual assault when a defendant threatens to use a dangerous weapon, or causes

bodily harm to the victim, or acts in a manner to threaten the life of the victim. (Compare Ill. Rev. Stat. 1989, ch. 38, par. 12—13 with Ill. Rev. Stat. 1989, ch. 38, par. 12—14.) Here, photographs and uncontroverted testimony from several witnesses established that the victim suffered bodily harm in the form of lacerations, bruises, and knife-made holes. This evidence rationally precluded the possibility of finding defendant guilty of criminal sexual assault rather than aggravated criminal sexual assault. See *People v. Rodarte* (1989), 190 Ill. App. 3d 992, 999-1000, 547 N.E.2d 1256.

In addition, where evidence shows that defendant is either guilty of the greater offense or not guilty at all, an instruction on the lesser included offense properly may be refused. (*Rodarte*, 190 Ill. App. 3d at 999-1000.) Here, defendant's defense was alibi. In this situation, the evidence at trial showed that defendant was either guilty of the greater offense of aggravated criminal sexual assault or not guilty at all; therefore, an instruction on the lesser offense was properly refused. See *People v. Palmer* (1989), 188 Ill. App. 3d 414, 427, 545 N.E.2d 743.

## IV

■ Defendant last claims that the circuit court erred by refusing his request to alter two pattern jury instructions to specify choking and biting in the bodily harm element of aggravated criminal sexual assault, as it was in the indictment. Illinois Pattern Jury Instructions, Criminal, Nos. 11.33, 11.34 (2d ed. Supp. 1989) (now Illinois Pattern Jury Instructions, Criminal, Nos. 11.57, 11.58 (3d ed. 1992)).

Pattern instructions in criminal cases are favored over alternatives. (*People v. Bachman* (1981), 92 Ill. App. 3d 419, 423, 414 N.E.2d 1369.) The court should modify these instructions where inadequate, but not otherwise. (*People v. Mitchell* (1984), 129 Ill. App. 3d 189, 199, 472 N.E.2d 114.) Whether a tendered nonpattern jury instruction should be given or refused is within the court's discretion. (*Mitchell*, 129 Ill. App. 3d at 199.) The pattern instructions given here adequately stated the applicable law. The court properly exercised its discretion in refusing the tendered modification.

For the reasons set forth above, defendant's conviction cannot be disturbed.

Affirmed.

McCORMICK, P.J., and SCARIANO, J., concur.